# Illinois Official Reports

## Appellate Court

---

### *People v. Ramos*, 2020 IL App (1st) 170929

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDDIE RAMOS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-17-0929 |
| Filed<br>Rehearing denied | March 27, 2020<br>May 5, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-18608; the Hon. Geary W. Kull, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Katherine Jane Miller, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Marci Jacobs, and Susan Wobbekind, Assistant State's Attorneys, of counsel), for the People. |

Panel

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Cunningham and Connors concurred in the judgment and opinion.

**OPINION**

¶ 1      The State charged and tried defendant Eddie Ramos as a principal for first degree murder, on the theory that he opened fire on a group of teenagers from a rival gang and killed a 15-year-old boy. The trial judge, sitting as the trier of fact, rejected that theory, finding the State's identification witnesses unreliable and its forensic evidence inconclusive. Indeed, by the end of Mr. Ramos's trial, the trial judge noted that another individual—who resembled Mr. Ramos and was known to the police but apparently never pursued in connection with this crime—had been "identified periodically during the course of th[e] trial" as the actual shooter. The trial judge stated on the record how troubled he was by this.

¶ 2      The judge nevertheless became convinced—based on an isolated statement that he thought that Mr. Ramos made during his hours-long videotaped interrogation—that Mr. Ramos knew in advance that there was "going to be *** some sort of drive-by" when he loaned his van to two individuals and, at the request of one, retrieved a gun that individual had hidden nearby and handed it to him. Thus, the judge found Mr. Ramos guilty on a theory of accountability for the actions of the uncharged shooter. Careful review of the videotape of Mr. Ramos's interrogation, however, reveals that what Mr. Ramos said was that *after* the shooting occurred, when the men who had borrowed his van returned and told him it was parked nearby but warned him not to drive it, he "guessed" that those men had been involved in a drive-by shooting.

¶ 3      The prosecutor, perhaps realizing that a conviction depended on the court's continued belief that the very "words out of Mr. Ramos's mouth" established his guilt by accountability, adopted this mischaracterization of the evidence for the first time in opposition to Mr. Ramos's posttrial motion. Unwilling to maintain that position on appeal, the State now argues that, even if Mr. Ramos did not say what the court believed he said, it can still be reasonably inferred from the circumstances described in Mr. Ramos's statement that he knew a shooting was going to take place and aided the person or persons who committed that crime. Having reviewed the videotape ourselves and considered in detail what Mr. Ramos told the police, however, it is clear to us that this is speculation on the State's part and not the proof beyond a reasonable doubt necessary to hold Mr. Ramos accountable for murder.

¶ 4      Simply put, the judge in this case found that, save for one very specific statement by Mr. Ramos, the State's case against him was wholly insufficient. We agree. Having further satisfied ourselves that Mr. Ramos did not make the statement in question, we must reverse his conviction.

¶ 5                              I. BACKGROUND

¶ 6      The State's theory throughout the trial in this case was that Mr. Ramos personally shot Miguel Villalba. As already noted, the trial judge, sitting as the trier of fact, found that the evidence completely failed to support this theory. However, since the court nevertheless found

Mr. Ramos to be guilty and because we may uphold that finding on any basis in the record (*People v. Dinelli*, 217 Ill. 2d 387, 403 (2005)), we will review the trial evidence in some detail.

¶ 7    On the evening of June 6, 2010, 15-year-old Miguel was shot and killed following a confrontation in Cicero between members of the La Raza and Latin Angels street gangs. Almost a year-and-a-half later, in November 2011, the State charged defendant Eddie Ramos with nine counts of first degree murder and one count of aggravated discharge of a firearm, alleging that he personally shot Miguel and shot at but missed Miguel's sister, Vanessa Villalba.

¶ 8    The State first called Vanessa, who testified that, at the time of the shooting, she and Miguel were part of a group of approximately 10 teenagers hanging out near the intersection of 15th Street and 50th Avenue in Cicero, when the group was approached by a man and a teenage girl named Alejandra, whom Vanessa recognized from school. The two groups began shouting at each other across the street. This continued for 5 to 10 minutes until one of the teens shouted, "He has a gun!" and everyone ran away from the intersection. Vanessa then heard four to five gunshots. She looked back and saw that the shooter—a different man than the one who had been standing with Alejandra—had long black hair that he wore loose, was, in Vanessa's words, "big *** mid-build maybe, not skinny," and was wearing a black shirt. Vanessa stopped when she saw that Miguel had been shot and waited with him for an ambulance as the rest of the group scattered.

¶ 9    Vanessa at first testified that she did not speak to the police immediately after the shooting. On cross-examination, however, she changed her story, agreeing that she had in fact spoken to the police that night. Contrary to a police report she was shown at trial, Vanessa claimed that she did not tell detectives at that time that she had not actually seen the shooter.

¶ 10    One week after the shooting, Vanessa viewed a photo array that did not include a photo of Mr. Ramos but did include a photo of a man named Gerardo "Mushroom" Pina. Asked at trial if she had identified anyone in that array as the shooter, Vanessa said "No." She then said that she could not remember. When Vanessa returned to the police department over a year later, on October 11, 2011, and was shown an in-person lineup that included Mr. Ramos but not Mr. Pina, she identified Mr. Ramos as the shooter. By that time, Mr. Ramos had lost a significant amount of weight and had close-cropped hair.

¶ 11    On cross-examination, Vanessa acknowledged that she was interviewed shortly before trial by two assistant state's attorneys (ASAs). She told the ASAs that the shooter had tattoos on his arms and a tattoo of a rosary around his neck. The ASAs showed Vanessa an additional photo array, from which she identified Mr. Pina as the shooter, though she said she was confused because Mr. Pina and another one of the individuals depicted (not Mr. Ramos) looked very similar. A photo of Mr. Ramos was also included in the array, and when specifically asked about him, Vanessa said she did not recognize him and was not sure if he had been at the scene of shooting. At trial, Vanessa was shown a photograph of the tattoos on Mr. Pina's chest and arms and agreed they were like those she had described to the ASAs.

¶ 12    Also testifying for the State were husband and wife Reynol Ramos (of no apparent relation to the defendant) and Zenna Miranda. At around 8:30 p.m. on the night of the shooting, the two were heading north on 50th Avenue, with Reynol driving and Zenna in the front passenger seat, when they approached the stop sign at 15th Street. From a distance of about two car-lengths, Zenna and Reynol observed two groups of people—four or five teenagers (although Reynol said some of the individuals appeared as young as nine years old) on one side of the

street and two men on the other—shouting at each other across 50th Avenue. According to Reynol and Zenna, one of the men suddenly walked across the street and shot several times at the teenagers.

¶ 13    Zenna described the shooter as Hispanic, medium-complected, with facial hair and "long, bushy hair down his back." He was wearing a "dark T-shirt, jeans, and a baseball cap." The man fired the gun with his left hand, which was closest to Zenna, and she noticed that he had large tattoos on his left arm. On cross-examination, Zenna agreed that she saw the shooter for "less than a minute," that everything "happened very quickly," and that it was "very hectic and very chaotic." On redirect examination, however, Zenna maintained that she had observed the shooter for "[a] few minutes, over a minute."

¶ 14    Reynol gave a similar description, recalling that the shooter was Hispanic, around 5 feet, 8 inches tall, of medium build but "sort of heavy," and with long black hair in a ponytail. According to Reynol, the man wore a black baseball cap turned backwards, a black T-shirt, and denim shorts falling just below his knee. Another man that the shooter was standing with was, according to Reynol, much shorter, 5 feet, 2 inches tall or less.

¶ 15    Zenna and Reynol saw the shooter run one block east down 15th Street and turn north into an alley. Reynol drove around the block and returned to the intersection to check on the teenagers. There they saw Miguel on the ground bleeding, and Zenna called 9-1-1.

¶ 16    The next day, Zenna and Reynol separately viewed a photo array that included side-by-side photos of Mr. Ramos and Mr. Pina. In the photos, the two are of similar build and complexion, each with long black hair and similar facial hair. Zenna was not able to identify the shooter from that photo array. According to her, she told the detectives at that time that she would prefer "to see actual people in person." Although Reynol insisted that he *did* identify Mr. Ramos as the shooter from the photo array, he likewise testified at trial that he told the police he wanted to see an in-person lineup. On cross-examination, however, Reynol acknowledged that, in fact, he had not made a positive identification from the photo array. He thought he had at least tentatively identified Mr. Ramos as the shooter but when pressed said, "[n]o, I guess I did not." And, despite the otherwise very specific description of the shooter that he provided, Reynol did not tell the detectives he spoke with at that time that the shooter had tattoos. When asked why, Reynol simply stated that he "wanted to see the actual person" first.

¶ 17    Zenna and Reynol were not contacted again until October 11, 2011, when they were separately shown an in-person lineup that included Mr. Ramos but not Mr. Pina. Although he looked quite different from the night of the shooting—they both noticed that Mr. Ramos had cut his hair, and Reynol stated that he had lost 50 pounds or more and was now wearing glasses—Zenna and Reynol both identified Mr. Ramos as the shooter from the lineup. Zenna acknowledged on cross-examination that the individual who had appeared next to Mr. Ramos in the photo array (Mr. Pina), whom she had thought looked like Mr. Ramos, was not in the lineup. She also agreed that no one in the lineup—including Mr. Ramos by that point—had long hair like she remembered the shooter having. When asked why she was able to recognize Mr. Ramos a year-and-a-half later but not the day after the shooting, Zenna explained that, when she initially viewed the photo array "I had a feeling it was the first one [Mr. Ramos], but I wanted to be sure. That's why I asked for actual people in front of me."

¶ 18    When asked if he told the officers that he was 100% sure of the identification he made from the in-person lineup, Reynol equivocated:

"I told them that I was sure it was him. But, you know, since he lost a lot of weight, you know like obviously he changed his appearance.

I told them—I told them that, you know, that I wasn't sure, but I told them that's him. But like you see what I am saying? He changed his appearance you know."

Reynol finally agreed that he told the detectives that Mr. Ramos looked like the shooter but he could not be 100% sure.

¶ 19 At the time of the shooting, Zenna and Reynol were working as community service officers for the City of Cicero. This, according to Reynol, is a paid position describing someone who "handle[s] minor police calls." By the time of trial, Reynol was enrolled in the police academy, training to be a Cicero police officer, and Zenna worked as a desk aide for the Cicero Police Department.

¶ 20 Sergeant Eric Prerost testified that he and his partner canvassed the area immediately after the shooting. In a gated gangway between two houses located approximately one block east and one block north of where the shooting occurred, they found a black T-shirt and a revolver with a black knit glove wrapped around the handle.

¶ 21 Officer Frank Savaglio testified that, at 11:22 p.m. on June 6, 2010, he observed a blue Oldsmobile passenger van pull out of a parking space approximately two blocks from where the shooting had occurred and turn without signaling. He conducted a traffic stop, and when the driver, who was Mr. Ramos, was unable to produce a valid driver's license, Officer Savaglio arrested him. Mr. Ramos was issued a traffic ticket and released. No weapons or relevant evidence was found in the van. According to Officer Savaglio, when the booking photo was taken, Mr. Ramos was 5 feet, 5 inches tall, weighed 220 pounds, and had long black hair and facial hair. He was wearing a white T-shirt and beige shorts.

¶ 22 The parties stipulated to certain facts. Miguel died of a pass-through gunshot wound to the head. The revolver recovered from the nearby gangway was in firing condition and contained six spent cartridge casings. Three of the four fired bullets recovered from the scene came from that weapon, and the fourth could not be ruled out as having come from that weapon. DNA found on the gun came from at least three individuals and was deemed unsuitable for comparison, the T-shirt found near the gun contained insufficient DNA for analysis, and the glove wrapped around the gun contained the DNA of two people—neither of whom was Mr. Ramos, and one of whom was identified as an individual who had been deported by the time of trial. A hair found inside the glove, however, did belong to Mr. Ramos.

¶ 23 On October 11, 2011, Mr. Ramos was questioned for several hours by Detectives Leuzzi and Savage at the Cicero Police Department. An electronic copy of the videotaped interview was entered into evidence at trial and made a part of the record on appeal. However, no transcript was ever provided. The video reveals that after being left alone for over an hour, Mr. Ramos was Mirandized (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and told that the detectives wanted to talk to him "about a situation that happened last year." Mr. Ramos indicated that he knew what the detectives were talking about. They told him that his DNA matched the DNA on the gun and that witnesses had identified him as the shooter. Mr. Ramos repeatedly denied that he was the shooter. But with respect to the gun he said, "I did touch it. *** I did hold it before that happened."

¶ 24 Mr. Ramos explained that although he had been a member of La Raza for a number of years, at the time of the shooting he was "having problems" with high-ranking members of the

gang and even believed they were responsible for burning down his house four years earlier. This caused Mr. Ramos to move his family from Cicero to Chicago. Mr. Ramos told the detectives he came back to his old neighborhood on the day in question because he was tired of keeping his family in hiding. As Mr. Ramos put it, he decided to "just come talk to them, you know, try to squash this whole thing."

¶ 25    Mr. Ramos arrived in Cicero at around 10 a.m. or 11 a.m. He had his four-year-old son with him. They spent some time at a nearby park, and Mr. Ramos helped a man install a car stereo in exchange for $40. After that, Mr. Ramos was hanging out with several members of La Raza, when the group received word that members of the Latin Angels were crossing 50th Avenue—the dividing line between the territories claimed by the two gangs. Two of the La Raza members, described by Mr. Ramos as a "[s]hort bald dude" and a young girl named Alex or "Ale," set out on foot in the direction of 15th Street to go "chas[e] them." A man Mr. Ramos knew as "Mushroom," and whose last name he thought was Pina, and another "old school La Raza" from the city then asked to borrow Mr. Ramos's van. Mr. Ramos gave them his keys. It was then that Mushroom asked Mr. Ramos to "grab that pistol"—a gun Mushroom had hidden earlier under a trash can in a nearby alley. Mr. Ramos retrieved the gun, handed it to Mushroom through the window of the van, and the two drove off, leaving Mr. Ramos and his son behind.

¶ 26    When asked why he did not go with them, Mr. Ramos said, "I had my kid. I was with my kid when all this bulls*** happened ***. They asked me to do it and I said no, 'cuz I had my kid with me." Mr. Ramos said, "I gave it to Mushroom," "[t]he glove and gun," and "[Mushroom] just closed the door and drove off. I didn't want to go. I told him *** I was with my son. I ain't going and doing something stupid like that when I have my son."

¶ 27    Two to three minutes later, Mr. Ramos heard gunshots. And several minutes after that, Mushroom and the other man came running from the nearby parking lot. They told Mr. Ramos that his car was parked on Cicero Avenue, but when he indicated that he wanted to leave with his son, they instructed him that he had to wait a while before he could retrieve his car. Although they told him nothing about what had happened, Mr. Ramos saw police vehicles speeding by and said he "figured they did it through the car. That's what I thought, 'cuz they didn't want me going in the car no more."

¶ 28    Mr. Ramos told the detectives that he spent a couple of hours with his son at a park before calling his mother for a ride. He returned to the area later that same evening to retrieve his van, was pulled over on 16th Street for a traffic violation, and was arrested for driving without a license.

¶ 29    From photographs, Mr. Ramos identified the black T-shirt found in the gangway near where the shooting took place as one of his that had been in his van. He had worn it earlier that day but took it off when he was installing the car stereo because he was too warm. Mr. Ramos also told the detectives that the gun found in the gangway looked like the one he had handed to Mushroom.

¶ 30    Mr. Ramos gave this same account several times during the interview, which lasted several hours. Only a few details of his story ever changed. He eventually acknowledged that it was not his mother who drove him home from Cicero after the shooting. Instead, high-ranking members of La Raza, the same ones who forbid him from driving his car home that night, "had a woman there take [him]. One of their females." When asked to give those individuals' names, Mr. Ramos said that doing so would jeopardize his family. When asked why he would associate

with members of La Raza if he thought they burned his house down, he said "It's not about being loyal to them. It's about the things they do."

¶ 31    Mr. Ramos also acknowledged that when he retrieved the gun for Mushroom, he slipped the glove wrapped around it onto his hand, but then "decided not to." He got into an argument with Mushroom and the other La Raza member, took the glove off, and gave it to one of them. When asked why, Mr. Ramos said, "cuz I didn't want to go. *** They wanted me to go do that, while I had my son in my custody. I didn't want to. Which is why we got into an argument. Right before they drove off."

¶ 32    The detectives, intent on getting Mr. Ramos to admit that he was the shooter, rejected this version of events completely. When they told Mr. Ramos that no one at the scene mentioned a van was involved in the shooting, he seemed surprised, saying "I figured it was a drive-by because they took my car. And since they parked it and came back and told me not to take off." The detectives told Mr. Ramos that his story made no sense, that two individuals had identified him as the shooter, and that if he just told them the truth, no one would have to go to trial.

¶ 33    Mr. Ramos said he understood that the evidence pointed to him but insisted that he was not the shooter. He pointed out that he had done nothing to avoid detection after the shooting; he drove the same vehicle and had the same job. He wanted to help them, but he could see they did not believe him. After talking to the police for almost four hours and answering all of their questions, Mr. Ramos finally asked to speak to a lawyer and the interrogation ended.

¶ 34    Detective Leuzzi's recollection of the interrogation at trial was consistent with what the video shows. The detective recalled that, when asked why he did not go with Mushroom in the car, Mr. Ramos said that "he did not want to get involved with this bulls*** because he had his child with him." During cross-examination, Detective Leuzzi confirmed that Mr. Ramos never told the detectives that he knew or intended that Mushroom would shoot anyone:

> "[BY MR. LOPEZ (DEFENSE COUNSEL)]:
>
> Q. Mr. Ramos didn't tell you that Mushroom wanted the gun to go shoot at any [Latin Angels], isn't that also true?
>
> A. Yes.
>
> Q. And Mr. Ramos didn't tell you that he knew that Mushroom was going to shoot anybody, isn't that true?
>
> A. Yes.
>
> Q. And during your conversation with Mr. Ramos, he didn't tell you that there was any kind of plan that he had with other La Razas to shoot that evening, isn't that also correct?
>
> A. Yes.
>
> Q. And in fact, Mr. Ramos told you that he didn't see who did the shooting, correct?
>
> A. Yes.
>
> Q. He didn't see the gun after he gave it to this person Mushroom, is that right?
>
> A. Correct.
>
> Q. And nobody told him what had happened, correct?
>
> A. I believe so, yes.
>
> Q. Nobody had brought the gun back to him and asked him to hide it or to do anything with it, isn't that also correct?

A. Correct."

¶ 35　　At the end of the second day of trial, on April 26, the trial judge received into evidence a copy of the videotaped interview on a flash drive and said he would review it before trial reconvened. On the third day of trial, held almost a month later on May 23, 2016, the judge returned the flash drive to the State, saying "I'm going to tender that back and indicate that I have viewed it thoroughly and we can proceed accordingly."

¶ 36　　The State rested, and Mr. Ramos moved for a directed verdict. Throughout the trial his defense had been directed entirely at undermining the State's identification of him as the shooter. During argument on the directed verdict, Mr. Ramos's counsel drew the court's attention to the fact that shortly before trial the State had to amend its discovery disclosures, revealing that the victim's sister Vanessa had identified someone other than Mr. Ramos as the shooter during the State's preparations for trial. And counsel questioned how the other two eyewitnesses, who had been unable to identify Mr. Ramos as the shooter immediately after the shooting, were somehow able to identify him—despite marked changes to his appearance—over one year later.

¶ 37　　As she had in her opening statement, the prosecutor said that it was still "the State's position that it was [Mr. Ramos] who was out there firing that gun that evening." But the prosecutor suggested, for the first time during her response to the motion for the directed verdict, after the State had rested, that "at the very least the defendant has made himself accountable in this." After questioning the prosecutor at length regarding the strength of the State's evidence that Mr. Ramos was the shooter, the court denied the motion without further comment.

¶ 38　　Mr. Ramos's sole witness, Jacqueline Lopez, completely undermined the State's attempts to convince the court that Mr. Ramos was the shooter. She testified that, on June 6, 2010, she was at home, on the 1400 block of South 49th Court, when she heard several gunshots. From a large window on the second floor, she saw a man she knew only as "Mushroom" jump over a gate and into a gangway between two buildings. She watched the man, who had long hair and wore a black T-shirt and dark blue jeans, remove the T-shirt, revealing a tattoo of a large rosary with a cross on his chest that Ms. Lopez said Mushroom was known to have. Ms. Lopez later observed the police recover a gun from that same gangway.

¶ 39　　Three days later, Ms. Lopez was questioned by police and shown a photo array, from which she identified Mr. Pina as Mushroom, the man she saw in the gangway. According to Ms. Lopez, "[e]verybody kn[e]w Mushroom in that block." He was "a troublemaker," was known to carry a gun, and was "always harassing little kids." Ms. Lopez observed Mr. Ramos in open court and was positive he was *not* the man she saw jump into the gangway. She confirmed on several occasions that she "told the police everything."

¶ 40　　According to Ms. Lopez, the police told her when they questioned her three days after the shooting that they would watch her for a couple of days to make sure the gang did not try to threaten her and that they would call her later regarding the case. Seven years passed and she never heard from them again.

¶ 41　　In his closing argument on May 23, 2016, defense counsel again focused on problems with the State's identification witnesses. When asked by the court to specifically address Mr. Ramos's videotaped statement and his possible accountability if he was not the shooter, counsel emphasized that nothing Mr. Ramos told the detectives established that he knew in advance there would be a shooting:

- 8 -

"Judge, his statement only indicates that he was there with Mushroom. That Mushroom asked him to get the gun and he went—I think he said he went under a garbage can and he got it. Mushroom didn't tell him what he was going to do with the gun. Mushroom didn't say they planned to go shoot anybody. ***

*** [I]n terms of accountability, there isn't really any advanced knowledge, so to speak, from my client to join in any practice that was going to happen. Somebody said the [Latin Angels] were chasing them. They didn't say they were going to shoot them, or they were going to go take care of business as they sometimes say. Or we are going to go do a burn, or we are—some type of words to express to my client that they were going to go out there and shoot somebody. For all we know they wanted the gun for self-protection in case they were shot at. This isn't a case where somebody came back to him and said, you know, guys, give me the gun. We are going to go shoot them. That's a different type of intent that you can infer from the defendant's action. Here all we know is what's on that statement that was recorded, and it doesn't indicate that my client had advance knowledge that these guys were going to take that gun and go three blocks away and start shooting at anybody. Again, we don't even know if the gun was loaded at the time that he gave the gun to the individuals, according to his statement.

*** And, you know, I know the State can change their theory any time they want. And now they have gone basically from maybe he's not the shooter, but I guess he's accountable. That's not proof beyond a reasonable [doubt]. *** There's a lot of doubts in this case."

¶ 42        In response, the prosecutor candidly acknowledged that there was "a problem" with the State's eyewitness identification testimony. For her, the source of that problem was clear: "looking at those photographs, [Mr. Ramos] and Mushroom do look alike. There are [a] lot of similarities. They have [a] similar build. They have similar hair. They have facial hair. They have tattoos." The State then switched tactics, urging the court to at least find Mr. Ramos guilty on a theory of accountability:

"[E]ven if you want to throw out the identifications, Judge, if you don't like them and you want to throw them out, then throw them out. It's my position and the State's position that this defendant is the shooter. But if you want to throw them out, thrown them out. Because guess what, he is still guilty of murder based on accountability. You have his statement, Judge. ***

When you remember and recall what the defendant says in the video, specifically at one point he says he gave the gun in a glove to Mushroom. I gave it to him. He points out to a photo of the gun. He identifies it. And he says that Mushroom then got in his car. Now counsel wants to oh, well, no, there's no accountability because there is no agreement They didn't have to stand there and make an agreement. Do you know how the defendant knew what was going on? Because he says in that video that he got into an argument with them because he didn't want to go because he had his son and he couldn't go and do something stupid like that when I have my son. So he knew what was going on. *** And according to the defendant, then Mushroom is in the car and he passes the gun to Mushroom. He says, then I hear shots. *I guess they were going to do a drive-by*.

So if you want to throw out the ID, Judge, that is accountability 101. Right there the defendant is guilty of murder." (Emphasis added.)

¶ 43 When the parties reconvened on July 8, 2016, for the court's ruling, the trial judge first made clear that the evidence presented at trial was insufficient to find that Mr. Ramos was the person who shot Miguel Villalba. Vanessa's in-court identification of Mr. Ramos as the shooter was, according to the judge, "impeached beyond any sort of normal impeachment" because she "actually identifie[d] a different person almost the day of trial to the State's Attorney." And the judge found it incredible that the State's other two eyewitnesses—whom he noted were employed by the Cicero Police Department—were inexplicably able to identify Mr. Ramos as the shooter almost a year-and-a-half later, when they had not been able to identify him from a photo array the day after the shooting. The court found that there was nothing in the police records to corroborate their story that they had at least tentatively identified Mr. Ramos from the photo array they were shown just after the shooting. The court noted that the State's DNA evidence, which merely established that several individuals had handled the murder weapon, also did not prove that Mr. Ramos was the shooter.

¶ 44 Relying solely on Mr. Ramos's own statements to the police, however, the court agreed with the State that Mr. Ramos was legally accountable for the shooting. The judge explained his ruling as follows:

"The fact remains that I find that, during the course of that statement, Mr. Ramos, without being forced to say anything, indicates that, yes, in fact, he did give the gun to someone; that that someone had asked him to do the shooting. To his everlasting credit, for what little credit there is, Mr. Ramos said that he wouldn't participate in that shooting; *but that he did know or did believe that it was going to be either some sort of a drive-by*. He had lent his vehicle, that van. *According to his own statement—these are the words out of Mr. Ramos' mouth*. They're not words that were put in his mouth. In fact, I think the officers were surprised that Mr. Ramos made these statements because they always believed that he was the shooter in this case.

*** I, unfortunately for Mr. Ramos, believe that because of his own words, for no other reason other than that." (Emphases added.)

¶ 45 The court found Mr. Ramos guilty by accountability of first degree felony murder (720 ILCS 5/9-1(a)(3) (West 2008)) and the aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), with the latter merging into the former.

¶ 46 In his posttrial motion, Mr. Ramos argued that "the mere retrieving of [an] owner's gun is insufficient to establish accountability." He reiterated that "[t]here was no discussion of a planned shooting or plan to use the weapon" and "no evidence *** that Mr. Ramos knew that Mushroom intended on shooting anyone that evening."

¶ 47 On February 6, 2017, the date set for argument on that motion, the court addressed Mr. Ramos directly, stating:

"I did indicate to both lawyers that I wanted to see either the disk of your interview with the police or transcripts, if there were transcripts of that disk. ***

* * *

I wanted to be able to see what your statement said exactly so that I know for sure that I'm not—because it's a very serious matter, and it involves a great number of years here. And I'm—I want to want to make sure I'm on firm ground with that."

The prosecutor confirmed that there was no transcript of the interview, and argument was postponed so that the judge could review the video again.

¶ 48    At argument almost two months later, defense counsel again argued that it was unclear from the videotaped interview that Mr. Ramos "knew that Mushroom intended to kill anyone or even to do anything with the gun other than go see what was going on." Counsel pointed out that "[t]here was never any discussion between Mushroom and Mr. Ramos" about this. Mushroom simply "directed Mr. Ramos to hand him the gun, and that's what [Mr. Ramos] did." Counsel reminded the court that Detective Leuzzi, who had questioned Mr. Ramos, "stated that Mr. Ramos never told him Mushroom wanted the gun to shoot at anybody," that "Mr. Ramos did not tell him Mushroom was going to shoot anybody [or] that there was any kind of plan," and that after the shooting "Mr. Ramos was not told what had happened." Counsel argued that absent the requisite shared intent "mere knowledge, mere presence is simply not enough" to find someone accountable for the criminal conduct of another. According to counsel, "Mr. Ramos did not aid or abet Mushroom *** because he didn't know what Mushroom was going to do. He didn't know he was about to commit this first degree murder or that he was going to discharge a weapon."

¶ 49    The State reiterated its argument that to prove accountability "there does not need to be an oral agreement to help assist in the offense." The prosecutor then gave her own summary of Mr. Ramos's statement:

> "What we have here in the defendant's statement is he says they knew the [Latin Angels] were coming. Mushroom told him to get the gun. The defendant went and got the gun, handed it inside the car. They drove off. *He said he figured there was going to be a drive by.*" (Emphasis added.)

¶ 50    The judge denied the motion and sentenced Mr. Ramos to the minimum sentence of 35 years in prison. Although he gave Mr. Ramos credit for not wanting "to participate in something that would be in some way dangerous and in some way violent because he had his son with him," the judge found that "[o]n the other hand," Mr. Ramos told the detectives that he "believed there was going to be a driveby." In the judge's view, "knowing that and [then] giving [Mushroom] the gun under the circumstances that he did" made Mr. Ramos accountable for the aggravated discharge and, by extension, felony murder. The judge reiterated the basis for his ruling:

> "All I do know is that from the evidence that I am confronted with is that I did not believe the State's witnesses that Mr. Ramos was the shooter.
>
> I did listen to his statement. I did listen to him say and explain how it was that his fingerprints were on that weapon. Whether or not he explained it honestly or not is for Mr. Ramos to deal with. *But his exact statement was that he gave the gun to Mushroom, and he thought there was going to be a driveby.*" (Emphasis added.)

¶ 51    The court made one additional observation:

> "The thing that really troubles me more than anything in the case is that the State presented a case that indicated that they believe Mr. Ramos was the shooter. That evidence was not convincing based on any number of things. And there is another person out there who had been identified periodically during the course of this trial as the shooter. And that person to the best of my knowledge has never been apprehended or punished for the death of this young man."

- 11 -

Mr. Ramos was sentenced on March 31, 2017, and timely filed his notice of appeal on April 7, 2017. We have jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Dec. 11, 2014), governing appeals from final judgments of conviction in criminal cases.

III. ANALYSIS

To sustain a conviction in a criminal case, the State must prove each element of an offense beyond a reasonable doubt. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 2. Mr. Ramos was found guilty of first degree felony murder. A person commits felony murder when he or she kills without lawful justification and, "in performing the acts which cause the death," was committing or attempting to commit a forcible felony other than second degree murder. 720 ILCS 5/9-1(a)(3) (West 2008). A forcible felony is any "felony which involves the use or threat of physical force or violence against any individual." *Id.* § 2-8. The underlying forcible felony in this case was the aggravated discharge of a firearm, which is defined to include the knowing or intentional discharge of a firearm in the direction of another person. *Id.* § 24-1.2(a)(2).

Mr. Ramos was found guilty of these offenses on a theory of accountability.

"A person is legally accountable for the conduct of another when:

* * *

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he [or she] solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." *Id.* § 5-2(c).

To prove the requisite intent, the State must establish either that (1) the defendant shared the criminal intent of the principal or (2) the two had a common criminal design—*i.e.*, they both intended to commit some other crime that was advanced by the crime charged. *People v. Fernandez*, 2014 IL 115527, ¶ 13. "Words of agreement are not required to prove a common design or purpose," which may instead "be inferred from the circumstances surrounding the crime." *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. Nor is active participation in the offense a prerequisite to guilt by accountability. *People v. Ruiz*, 94 Ill. 2d 245, 254 (1982). Here, the State's argument—both in the trial court (once the State changed its theory to accountability) and on appeal—has always been that Mr. Ramos and the shooter both intended for a shooting to occur, with that shooting constituting the aggravated discharge of a firearm that served as the predicate felony for Mr. Ramos's felony murder conviction.

Mr. Ramos contends that the State failed to prove beyond a reasonable doubt that he had any intention of promoting or facilitating a shooting, or indeed that he even knew that a shooting was going to take place. When the sufficiency of the evidence supporting a criminal conviction is challenged, "[t]he relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Ward*, 215 Ill. 2d 317, 322 (2005). A conviction must be reversed if "the evidence is so unreasonable, improbable or

unsatisfactory that it raises a reasonable doubt of [the] defendant's guilt." *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 58 The trial judge was persuaded that Mr. Ramos knew a shooting was going to take place and aided in that crime by lending his van and retrieving a gun based on a single statement the judge thought Mr. Ramos made during his lengthy videotaped interrogation. The judge indicated both in his initial finding and in denying the posttrial motion that Mr. Ramos, at the time he lent his van and recovered the gun, "did know or did believe that it was going to be either [*sic*] some sort of a drive-by."

¶ 59 However, as Mr. Ramos points out on appeal, as our own review of his lengthy videotaped interrogation confirms, and as even the State now implicitly acknowledges, the judge either misheard or misremembered that statement. We have reviewed Mr. Ramos's videotaped interrogation in its entirety and reviewed the relevant portions multiple times. It is clear to us that the trial judge was mistaken. Perhaps understandably so. Although the record indicates that the judge took care to review the video not once but twice, this was no simple task. The recording is several hours long, with many large breaks in the questioning. The voices of the officers are loud, while Mr. Ramos's is at times soft, making it difficult to listen to without constantly adjusting the volume. The detectives' lines of questioning trail off and are repeated or picked up again minutes or hours later. And finally, there is no transcript.

¶ 60 Nevertheless, the trial judge was mistaken. What did Mr. Ramos actually tell the detectives? That he "*figured* it was a drive-by." (Emphasis added.) When did he "figure" this? After Mr. Pina and his companion drove off, after Mr. Ramos heard the gunshots, and after he was informed by high-ranking members of La Raza that although his vehicle was parked nearby, he was forbidden from driving it home that night. Then, and only then, did Mr. Ramos put two and two together to guess—incorrectly, as the shooter was on foot—that a drive-by shooting had occurred. Mr. Ramos's statement to this effect is not an admission regarding what he believed or intended when he handed over the keys to his van or retrieved Mr. Pina's gun.

¶ 61 Our characterization of this evidence is consistent with Detective Leuzzi's testimony that Mr. Ramos never told the Cicero police that he knew in advance that Mr. Pina intended to shoot anyone. It is also consistent with the commendably accurate summary of Mr. Ramos's videotaped statement that now appears in the State's appellate brief:

"Defendant said that Mushroom didn't tell him what they did, but when asked by the detectives what defendant '[thought] happened,' defendant stated: 'Well, I heard the gunshots.' [Citation.] He 'figured they did it through the car,' he 'figured it was a drive by because they took [his] car and because they parked it and told him not to take off.' [Citation.] When asked by detectives if it 'was an intended hit? Was there a plan?' defendant did not answer. [Citation.] When asked who did the shooting, defendant said: 'Obviously someone in the vehicle.' "

¶ 62 In contrast to its candor on appeal, at argument on Mr. Ramos's posttrial motion, the State unfortunately adopted the judge's mistaken impression of the evidence, stating:

"What we have here in the defendant's statement is he says they knew the [Latin Angels] were coming. Mushroom told him to get the gun. The defendant went and got the gun, handed it inside the car. They drove off. *He said he figured there was going to be a drive by*." (Emphasis added.)

¶ 63    On appeal, while the State recognizes the trial judge's mistake, it attempts to minimize it, framing it as an inconsequential mix-up between a drive-by shooting and a shooting on foot. The State is correct that it would not matter what *type* of shooting was intended, so long as Mr. Ramos and the shooter both intended for a shooting to take place. But that is not the nature of the trial judge's error. The judge believed Mr. Ramos admitted to having *advance knowledge* of a shooting. He did not.

¶ 64    The State now retreats to the position that, given the circumstances, Mr. Ramos *must have known* that a shooting would occur. The State repeatedly insists that this "is the *only* reasonable inference to be drawn from Mr. Ramos's statements" and that it is clear from those statements that Mr. Pina and the others, "along with [Mr. Ramos], planned the shooting the minute they found out rival gang members deigned to enter 'their' gang territory." (Emphasis added.) This is not a reasonable inference from Mr. Ramos's statement; it is speculation.

¶ 65    We agree with the State that one could reasonably infer from certain statements Mr. Ramos made to the police that there was something he told Mushroom he would not do. Mr. Ramos told the detectives, for instance, that the men in the van "asked [him] to do *it* and [he] said no" because he had his son with him. (Emphasis added.) He also told them he did not want to do "something stupid *like that*." (Emphasis added.) But there is a gap between what can reasonably be inferred from those statements and the State's insistence that a shooting, in particular, was intended. It is just as likely that the "something stupid" Mr. Ramos did not want to participate in while he had his 4-year-old son with him was *any* sort of gang confrontation. To presume more is to assume, unreasonably, that every gang confrontation will necessarily result in a shooting. And, while we agree with the State that Mr. Ramos's statement is "significantly corroborated by other physical and testimonial evidence"—Mr. Ramos explained why his hair was found in the knit glove, for example, and that the black T-shirt discarded in the gangway was one he had earlier placed in his van—none of the corroborating details help bridge this gap between what Mr. Ramos told detectives and what the State would have us believe regarding his intent just prior to the shooting.

¶ 66    We agree with the State that the shooting in this case was not a "wholly spontaneous event," like the one in *People v. Taylor*, 186 Ill. 2d 439, 448 (1999), a case relied on by Mr. Ramos. The defendant in that case, who was driving around with a friend he knew to be armed, could hardly have suspected that the two would become involved in an automobile accident and subsequent altercation, during which his friend would shoot at the driver of the other car. *Id.* at 442-43. Our supreme court reversed the defendant's aggravated discharge of a firearm conviction, finding there was "no evidence that the defendant had knowledge of his passenger's intent." *Id.* at 447.

¶ 67    Although factually different, in our view, far more instructive is the analysis in *People v. Johnson*, 2014 IL App (1st) 122459-B. The defendant in that case was driving around the neighborhood, picked up the shooter, and stopped by the victim's vehicle to ask if he had any marijuana for sale. *Id.* ¶ 7. The shooter exited and shot the victim several times before getting back in the vehicle, at which point the defendant drove away. *Id.* ¶ 1. The defendant maintained that he did not know his passenger was armed or that he intended to shoot anyone. *Id.* ¶ 151. The two were tried separately, the shooter was acquitted, and the defendant was found guilty of first degree murder on a theory of accountability. *Id.* ¶ 1. This court reversed, finding the evidence presented at trial was insufficient to hold the defendant legally accountable for the shooting where "there was neither evidence of a prior intent or advance planning by [the]

defendant to transport [the shooter] to shoot the victim." *Id.* ¶¶ 128, 133. We noted that the "defendant's presence at the crime scene, his knowledge that a crime had been committed, and any subsequent flight [did] not amount to accountability." *Id.* ¶ 134.

¶ 68    Notably, we rejected the State's argument that we could infer advance knowledge of the shooting from the defendant's own statements to the police, which we characterized as "an after-the-fact account of the events that had already taken place the night of the murder," from which it was "impossible to tell *** what [the] defendant's intentions were prior to the shooting." *Id.* ¶ 145. We also found the defendant's statements that he and the shooter " 'got on [the victim]' " and " 'pulled a move from the car' " were "far too ambiguous" to convict the defendant on a theory of accountability, where the phrase " 'busting a move' " or " 'pull[ing] a move' " could mean "purchasing drugs, beating or shooting a person, or other interpretations based on the context in which the phrase [was] used." *Id.* ¶ 147. We concluded that even if after the shooting the defendant had, as some of the testimony indicated, beckoned the shooter to return to the vehicle, telling him, " '[c]ome on or I'm going to leave you,' " that still did not show that before the shooting, the defendant knew what the shooter intended to do. *Id.* ¶ 151.

¶ 69    As in *Johnson*, here the State's arguments are, to a large extent, about what Mr. Ramos did *after* the shooting. It points out that instead of running away he waited for Mr. Pina and his companion to return, stayed with them, "worked with them to take him home and then return to pick up his car," and never reported the crime. Although it is true that a defendant's continued association with other offenders and failure to report the crime are circumstances a finder of fact may consider in determining whether the requisite intent has been shown (*Willis*, 2013 IL App (1st) 110233, ¶ 79), here it is quite clear from Mr. Ramos's statements that he was afraid of the La Raza members involved in the shooting, wanted to leave much sooner, and was not in a good position to defy them, as he still had his young son with him. In light of these facts, the State's insistence that Mr. Ramos "could have refused to help them at any point during their preparations yet did not" also rings hollow.

¶ 70    The State's argument that Mr. Ramos's history as a member of La Raza proves that he "voluntarily attached himself to a group bent on illegal acts with knowledge of its design" (internal quotation marks omitted) (*id.*)—an additional factor from which a common intent or purpose could be inferred—is likewise weakened by Mr. Ramos's explanation that he had been in conflict with members of the gang for some years and was in Cicero that day to try to resolve things with them so that he and his family did not need to live in fear.

¶ 71    The weakness of the evidence supporting a theory of accountability is unsurprising, perhaps, given that accountability was not what the State set out to prove at Mr. Ramos's trial. As noted, the State charged and tried Mr. Ramos as a principal, alleging in its indictment that he personally "shot and killed Miguel Villalba while armed with a firearm during the commission of a forcible felony, to wit: [the] aggravated discharge of a weapon in the direction of Vanessa Villalba."

¶ 72    A defendant, like Mr. Ramos, who has been charged as a principal, though not found guilty on that basis, may nevertheless be convicted on a theory of accountability. *People v. Ceja*, 204 Ill. 2d 332, 361 (2003). As our supreme court has made clear, "[c]ourts permit this pleading practice because accountability is not a separate offense, but merely an alternative manner of proving a defendant guilty of the substantive offense." *Id.* In most cases, however, it is apparent at least by the outset of a trial that the State intends to prove a defendant's guilt by

accountability. In *Ceja*, for example, the State made clear in its opening statement that, although the evidence would not establish which shooter killed which victim, the defendant was one of two occupants of a stolen vehicle it sought to hold accountable for the deaths of two rival gang members. *Id.* at 336.

¶ 73    Here, it was only after the State had rested its case-in-chief and was struggling to respond to defense counsel's motion for a directed verdict that the prosecutor first suggested that even if the court disbelieved all of the State's witnesses, "guess what, [Mr. Ramos] is still guilty of murder based on accountability." Considering all of the above, the evidence was simply insufficient to prove Mr. Ramos was accountable for the shooting death of Miguel Villalba. It was only because the trial court misremembered an isolated statement by Mr. Ramos and incorrectly believed that he admitted to having advance knowledge that a shooting would take place that the court concluded that he was guilty.

¶ 74    As already noted, the State has abandoned on appeal its theory that Mr. Ramos was the principal shooter in this case. Even if it had not, we would find no reason to disturb the trial court's finding that the evidence was insufficient to support that theory for the well-articulated reasons provided on the record by the trial judge. See *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) (a reviewing court does not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses).

¶ 75    Outright reversal, and not remand for a new trial, is appropriate where, as here, the evidence presented at trial was insufficient to support a defendant's guilt. *People v. Thompson*, 2017 IL App (3d) 160503, ¶ 17. In light of this holding, we need not consider Mr. Ramos's alternative argument that the trial court's mischaracterization of the evidence denied him a fair trial.

¶ 76                                    IV. CONCLUSION

¶ 77    For all of the above reasons, the State failed to prove Mr. Ramos's guilt beyond a reasonable doubt. His conviction is reversed.

¶ 78    Reversed.