2023 IL App (1st) 153356-U

FIFTH DIVISION
December 15, 2023

No. 1-15-3356

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 13267 |
| | ) | |
| FERNANDO CANTU, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Mitchell and Justice Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's convictions for residential burglary and domestic battery are affirmed where the State presented sufficient evidence to sustain the convictions.

¶ 2    Following a bench trial, defendant Fernando Cantu was found guilty of residential burglary and domestic battery, for which he received concurrent sentences of 14 years and 6 years, respectively. On appeal, Mr. Cantu argues that the complaining witness's testimony was not credible, and that the State's evidence was therefore insufficient to support the trial court's findings of his guilt beyond a reasonable doubt. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State charged Mr. Cantu with aggravated kidnapping, aggravated criminal sexual assault, home invasion, residential burglary, and domestic battery, charges stemming from his interactions with the complaining witness, Cristal Cohn, on June 9 and 10, 2013. At the bench trial held on October 30, 2014, Ms. Cohn testified that she had been drinking heavily, including while she was at the police station, and could not remember very much from that period. Ms. Cohn was shown an 8-page written statement given to the police on June 11, 2013, however, and although she did not recognize the document or recall providing the statement, she confirmed that it was her signature on the bottom of each page.

¶ 5      Assistant State's Attorney (ASA) Robert Kline testified that Ms. Cohn came to the Chicago Police Department on June 11, 2013, and described events that had unfolded over the previous two days to him and to Detective Murawski (no first name given). ASA Kline sat next to Ms. Cohn and typed up her statement as she relayed it to him. He then printed the statement, and they reviewed it line by line to ensure its accuracy. Ms. Cohn initialed one change to correct a typo, and she, ASA Kline, and Detective Murawski each signed the bottom of every page of the statement.

¶ 6      Ms. Cohn's statement was admitted as substantive evidence and read into the record at trial by ASA Kline. Although it is unclear from the transcript whether it was admitted under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2012) (providing that prior inconsistent statements are substantively admissible where, among other things, the witness is subject to cross-examination, had personal knowledge of the events described, and the statement was signed by the witness)) or section 115-10.2a (*id.* § 115-10.2a (providing that out-of-court statements may be substantively admissible where the declarant is a person protected by the Domestic Violence Act of 1986 and where that individual "testifies to a lack of memory of the

subject matter" of the statement)), the admissibility of the statement was not challenged below and is not at issue on appeal. The statement was the primary evidence relied upon by the State, and we consider it in detail below, noting where it was corroborated or refuted by other evidence, including Ms. Cohn's trial testimony.

¶ 7                          A. Ms. Cohn's Relationship with Mr. Cantu

¶ 8     According to the statement Ms. Cohn gave to ASA Kline and Detective Murawski, she and Mr. Cantu were involved in an on-again, off-again relationship for about eight or nine months. During that time, they got into many verbal arguments, some leading to violent interactions, and they broke up more than twenty times.

¶ 9     Ms. Cohn's testimony at trial was consistent with this. She said that Mr. Cantu "hit me and I hit him as well" and that over the course of their tumultuous relationship she had called the police on him two or three times, when he punched her in the face, threatened to kill her, and lunged at her with a knife. When Ms. Cohn was asked at trial whether Mr. Cantu once made a copy of her apartment key, kept her in the apartment for three days, and repeatedly physically abused her and threatened her with a knife, she replied that she vaguely remembered the incident but not in detail. When asked whether she called the police regarding that incident, Ms. Cohn testified, "I probably did. I can't recall that time, but I probably did." Ms. Cohn testified that throughout the course of their relationship she feared Mr. Cantu.

¶ 10                         B. The Events of June 9 and 10, 2013

¶ 11    In her written statement, Ms. Cohn stated that in June 2013 she was employed at Home Run Inn Pizza. She was working late on June 8, 2013, and returned to her apartment around 12:15 a.m., early in the morning of June 9. When Ms. Cohn put the key in the lock, she felt a presence and noticed Mr. Cantu standing behind her. In the written statemen, she also stated that she and

Mr. Cantu had been broken up for approximately a month when this occurred and that she was the one who had ended the relationship. At trial, however, she could not recall whether they were broken up at that time. She noted that their relationship "was nothing like steady" and said "[w]e probably did break up."

¶ 12    In her written statement, Ms. Cohn said Mr. Cantu then told her to "get the f**k upstairs." She opened her apartment door, and he shut it behind them, asking her, "You think you were going to leave me?" before hitting her in the forehead with a closed fist. Ms. Cohn ran to her bedroom and curled into a defensive position on her bed, which she had pushed against the wall. She stated that Mr. Cantu came into the room and hit her all over her body with closed fists, stopping only when he said that his knuckles began to hurt.

¶ 13    Mr. Cantu then shook out his hands and told her to "get the f**k over here." He pulled her by her legs to the edge of the bed, took off her pants and underwear, and lowered his own. Ms. Cohn was crying and was afraid he would hit her again if she said anything. Mr. Cantu then began to have vaginal intercourse with her while removing her shirt and bra and ejaculated inside her without wearing a condom. Afterwards, Mr. Cantu kissed her on the forehead, laid down next to her, and told her to calm down. She stayed there all night, too afraid to get up. At one point she heard Mr. Cantu break her phone in the other room, saying "B**ch, now you can't call the cops."

¶ 14    Later that morning, when Ms. Cohn had to use the bathroom, Mr. Cantu followed her and forced her to use it with the door open. He told her he thought she would try to leave and tell the police what happened. He gave her permission to shower but remained directly next to the bathroom while she did so. Mr. Cantu refused to take Ms. Cohn to the hospital so that she could be treated for the pain she was experiencing and the bruising on her leg.

¶ 15    Ms. Cohn was supposed to work that day at 4:00 p.m., but Mr. Cantu told her she could

not go. At around 2:00 p.m., he called her place of employment, put the phone on speaker, and had Ms. Cohn tell her employer she had been hit in the head while playing softball. She was told to bring a doctor's note with her the next day. That evening, Mr. Cantu forced Ms. Cohn to sleep against the wall so he would know if she tried to get up. He remained next to her all night.

¶ 16    The next morning, on June 10, 2013, Ms. Cohn told Mr. Cantu that she needed to go to work and show them her head injury or she would be fired. In her written statement, Ms. Cohn stated that Mr. Cantu drove her to work in her car. He warned her not to tell anyone what really happened or to call the police. She spoke briefly with her manager while Mr. Cantu waited for her, and then he drove them straight back to her apartment. In her written statement, Ms. Cohn said that she was too embarrassed to tell her manager the truth at that time. At trial, however, Ms. Cohn testified that she drove herself to work, stopping for another bottle of alcohol on the way back to her apartment.

¶ 17    Frank Delmora, Ms. Cohn's manager at Home Run Inn Pizza, confirmed that Ms. Cohn came into work on June 10, 2013, with a baseball cap on and removed it to show him the bump on her head, which she claimed was a softball injury.

¶ 18                                    C. Getting Help

¶ 19    Ms. Cohn said in her written statement that when she and Mr. Cantu returned to her apartment, she was scared he would hurt her if she tried to leave, but she tried to devise a plan to get out of the apartment. She promised not to tell anyone what had happened or run away, and he eventually agreed to drive her to a nearby 7-Eleven to buy cigarettes. When Mr. Cantu parked in the lot, another car struck the vehicle, and he got out of the car to speak to the other driver. Ms. Cohn took this opportunity to run into the 7-Eleven and ask the clerk to call the police. She watched Mr. Cantu get back in the car and drive away quickly.

¶ 20    Officer Salaz, one of the officers who responded to the call, testified at trial that he observed a bump on Ms. Cohn's forehead and that she was frantic and possibly intoxicated. Ms. Cohn informed the officers that she and her boyfriend had had a verbal altercation that turned physical when he struck her with a closed fist and that he had taken her vehicle and driven off with it. She did not tell the officers that Mr. Cantu had kidnapped or sexually assaulted her, explaining in her written statement that they were being short with her and not listening to her. She said they gave her a paper with a report number and left to respond to another matter.

¶ 21    Ms. Cohn then called her mother from the 7-Eleven and stayed with her that night. The next morning, they looked around for Ms. Cohn's car but could not find it. Ms. Cohn returned to her apartment building and retrieved her spare key from her neighbor. She then called the police and asked them to check her apartment before she entered it. Officer Ponce responded to the call and entered the apartment with another officer, where they found Mr. Cantu and arrested him.

¶ 22    Erika Oceguera, a nurse at Holy Cross Hospital, testified that she examined Ms. Cohn on June 11, 2013, and observed bruising on her forehead, right thigh, right buttock, inner left thigh, and right upper arm. Ms. Oceguera administered a sexual assault kit. Ms. Cohn informed her that she had showered earlier. Ms. Oceguera testified that showering can degrade possible DNA left on the body. She also testified that heavy drinking could lead to memory loss, and that a person might or might not remember events from a time when they had been drinking.

¶ 23    The parties stipulated that no semen was found in the swabs from the sexual assault kit.

¶ 24                              D. The Court's Findings

¶ 25    Defense counsel moved for a directed finding on all charges, arguing that Ms. Cohn's written statement was unreliable because: (1) she was highly intoxicated at the time; (2) she had multiple opportunities to make an outcry; (3) her injuries could have resulted from falling when

she was drunk; and (4) she kept going back to Mr. Cantu despite what she said about how he treated her. The trial court granted the motion with respect to the four counts of aggravated kidnapping and four counts of home invasion.

¶ 26 The court concluded that the State had not proved beyond a reasonable doubt that Mr. Cantu was guilty of aggravated criminal sexual assault or burglary based on aggravated criminal sexual assault. It found him guilty of the two counts of burglary based on his entry into Ms. Cohn's dwelling place—in the early morning hours of June 9, 2013, and again the next day when he left her at the 7-Eleven and returned to her apartment—with the intent to commit domestic battery. The court believed it was logical to infer that Mr. Cantu remained in the apartment on that second occasion because he was waiting for her to arrive so he could beat her again. Based on the photographs taken of her injuries shortly after the events described in Ms. Cohn's statement, the court concluded that Mr. Cantu had struck Ms. Cohn and found him guilty of the domestic battery charges as well, which were merged into a single count. The trial court thus found Mr. Cantu guilty on two counts of residential burglary and one count of domestic battery.

¶ 27 At sentencing, defense counsel stipulated to the accuracy of the presentence investigation report, which indicated that Mr. Cantu had seven prior felony convictions, including five for domestic battery, and two misdemeanor domestic battery convictions. The trial court sentenced Mr. Cantu to concurrent sentences of 14 years for residential burglary and 6 years for domestic battery. Mr. Cantu appeals these convictions.

¶ 28                                    II. JURISDICTION

¶ 29 The trial court sentenced Mr. Cantu on August 13, 2015, and he filed a timely notice of appeal that same day. We initially had jurisdiction over this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603

(eff. Feb. 6, 2013) and 606 (eff. Dec. 11, 2014), governing appeals from final judgments in criminal cases. Although this appeal was dismissed for want of prosecution on November 25, 2019, on November 15, 2022, our supreme court exercised its supervisory authority under article VI, section 16, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 16) and directed this court to reinstate the appeal, which we did on November 16, 2022.

¶ 30                                    III. ANALYSIS

¶ 31     Mr. Cantu argues that the State's evidence was insufficient to find him guilty beyond a reasonable doubt of residential burglary and domestic battery because Ms. Cohn was unable to recall the details of the incident at trial and testified that she was intoxicated during much of the time period in question, including during her visit to the police station, where she purportedly provided a written statement. For the reasons that follow, we find that the evidence was sufficient to support the convictions.

¶ 32     In criminal cases, the State has the burden of proving each element of an offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. "When the sufficiency of the evidence supporting a criminal conviction is challenged, '[t]he relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Ramos*, 2020 IL App (1st) 170929, ¶ 57 (quoting *People v. Ward*, 215 Ill. 2d 317, 322 (2005)). "It is not the role of the reviewing court to retry the defendant," but "[r]ather, it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Gray*, 2017 IL 120958, ¶ 35. Accordingly, a reviewing court will defer to the findings of the trier of fact "on questions involving the weight of the evidence or the credibility of the witnesses" and will only reverse a criminal conviction if "the evidence is so unreasonable,

improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 33    Testimony from a single witness, "if it is positive and the witness credible," is sufficient to support a conviction. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Great deference is given to the fact finder in determining the credibility of a witness, and this court will only reverse where the witness's testimony is so "fraught with inconsistencies and contradictions" and "so lacking in credibility that a reasonable doubt of [the] defendant's guilt remains." *People v. Schott*, 145 Ill. 2d 188, 206-07 (1991).

¶ 34    Here, Mr. Cantu was found guilty of domestic battery and residential burglary. A person commits domestic battery "if he or she knowingly without legal justification by any means *** [c]auses bodily harm to any family or household member." 720 ILCS 5/12-3.2(a)(1) (West 2012). A person commits residential burglary "who knowingly and without authority enters or *** remains within the dwelling place of another, or any part thereof, with the intent to commit therein a felony or theft." *Id.* § 19-3(a). Domestic battery is a Class 4 felony under the Illinois Criminal Code of 2012 where the defendant has a prior conviction for domestic battery. *Id.* § 12-3.2(b).

¶ 35    For the domestic battery charge, Mr. Cantu argues that Ms. Cohn conceded at trial that her injuries could have been caused by her falling over as a result of her intoxication. However, the trial judge found that there was "physical evidence of the injury," as "seen by the photographs relatively shortly after the event" and that there was "no doubt in [his] mind whatsoever that [Mr. Cantu] struck [Ms. Cohn]." Although Ms. Cohn responded to questions from both the State and the defense with "I don't know," "I don't remember," and "I have like no recollection," the trial court found Ms. Cohn's written statement to the police and the photographs of her taken at the police station more trustworthy than her equivocations and lack of memory during her trial testimony. We have long recognized that the trial court is in a better position than the reviewing

court to analyze witness credibility as "it may observe the witnesses' demeanor and consider any conflicts or inconsistencies in their testimony." *People v. Curtis*, 296 Ill. App. 3d 991, 999 (1998).

¶ 36     Ms. Cohn did not recant her prior statement, nor did she provide a completely contradictory statement at trial. Even if she had, however, the trial court would have been justified in believing her written statement over her testimony at trial. In assessing credibility and weighing all admissible evidence, the fact finder may find a prior statement more trustworthy than the witness's trial testimony. *People v. Morrow*, 303 Ill. App. 3d 671, 677 (1999) (concluding that a previous inconsistent statement, where at trial a witness recanted both her pretrial statement and grand jury testimony, was alone sufficient to prove the defendant's guilt beyond a reasonable doubt); *Curtis*, 296 Ill. App. 3d at 1000 (concluding that the trial court could have found the witness's written statement more believable than his contradictory trial testimony). In sum, neither Ms. Cohn's concessions at trial nor her lack of memory on the matter are sufficient for us to reject the trial court's determination that her prior written statement was credible.

¶ 37     Mr. Cantu also argues that because Ms. Cohn testified that she was intoxicated during the relevant time period, including during her visit to the police station, her written statement should not be considered reliable. Evidence of a witness drinking near the time of the incident about which they testify is probative of the witness's sensory capacity and affects the weight given to their testimony. *Gray*, 2017 IL 120958, ¶ 40. However, the fact that a witness was drinking alcohol or was drunk at the time of the incident does not ultimately preclude the trier of fact from finding the witness credible. *Id.*

¶ 38     Here, it is clear that the court found Ms. Cohn's contemporaneous written statement to be credible. ASA Kline testified that he typed up the 8-page statement as Ms. Cohn provided it to him, then printed it and went through it line by line with her. Only one grammatical error was

addressed and fixed, and ASA Kline, Officer Murawski, and Ms. Cohn signed each page. As noted above, Ms. Cohn's prior written statement was admitted without objection as substantive evidence. Ms. Cohn was subject to cross-examination. When presented with the written statement at trial and asked whether she spoke to the officers, Ms. Cohn testified, "I said I was very intoxicated. I don't remember. I don't remember. I was still drinking that whole day," and testified that she did not remember telling ASA Kline anything. Ms. Cohn did, however, recognize her signature on the pages of the statement.

¶ 39    The trial court weighed the evidence surrounding Ms. Cohn's inability to recall at trial, her claimed intoxication during that time period, and the lengthy and detailed statement she acknowledged signing shortly after the date of the charged offenses. Having considered all of this, the court found Mr. Cantu guilty beyond a reasonable doubt. The trial court is in the best position to assess the witness's credibility and may find a prior inconsistent statement more trustworthy than the witness's trial testimony. We do not find this so unreasonable or improbable that we would conclude the evidence presented was insufficient to support the trial court's findings of guilt.

¶ 40    Mr. Cantu further argues that the residential burglary charge should be dismissed because the State failed to prove that he did not have authority to enter Ms. Cohn's apartment. The trial court determined that Mr. Cantu entered the home without authority on two occasions. It reasoned, for the first instance, that Mr. Cantu's statement, "get the f**k upstairs," coupled with Ms. Cohn's description of what followed, were sufficient to prove he did not have authority to enter. In regard to the second instance, the trial court considered that Mr. Cantu left Ms. Cohn at 7-Eleven, took her car, and drove away with her house keys in the car. The court reasoned, "he [Mr. Cantu] didn't take anything. There isn't any evidence that he took anything from the apartment. The only reasonable inference from him remaining in the dwelling place of Cristal Cohn was [to] wait for

11

her to show back up so he could beat her again."

¶ 41    After trial, Mr. Cantu sought continuances for multiple months, awaiting responses to subpoenas he believed would prove he was living in the apartment with Ms. Cohn. However, no evidence was brought to light to prove he had authority to enter the premises on these two occasions. Ms. Cohn testified at trial that although Mr. Cantu spent the night occasionally, her name was the only name on the lease. We find that although Ms. Cohn could not recall the incident and its surrounding circumstances at trial, the trial court was entitled to rely on her contemporaneous signed written statement to the police as a credible account of what took place, and that it was reasonable to infer from that statement that Mr. Cantu entered Ms. Cohn's apartment without permission on the two occasions described above.

¶ 42    The evidence was sufficient to sustain Mr. Cantu's convictions for domestic battery and residential burglary.

¶ 43                                IV. CONCLUSION

¶ 44    For all of the above reasons, we affirm Mr. Cantu's convictions.

¶ 45    Affirmed.